UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LAURA KARR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| DOW AGROSCIENCES LLC, THE | ) | |
| DOW CHEMICAL COMPANY U.S. | ) | |
| SEVERANCE PLAN, THE DOW | ) | 1:10-cv-00975-LJM-TAB |
| CHEMICAL COMPANY TRANSITION | ) | |
| PAYMENT PROGRAM, THE CLAIMS | ) | |
| REVIEW COMMITTEE OF THE DOW | ) | |
| CHEMICAL COMPANY U.S. | ) | |
| SEVERANCE PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pending before the Court is defendants', Dow Agrosciences LLC ("DAS"), the Dow Chemical Company U.S. Severance Plan ("USSP"), the Dow Chemical Company Transition Payment Program ("TPP"), and the Claims Review Committee of the Dow Chemical Company U.S. Severance Plan ("Review Committee") (collectively, "Defendants"), Motion for Summary Judgment [Dkt. No. 41]. Plaintiff, Dr. Laura Karr ("Dr. Karr") brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and related state causes of action. The Court has reviewed the parties' submissions and **GRANTS** Defendants' Motion.

1

## I.  BACKGROUND

Dr. Karr began working for the Dow Chemical Company in 1989, eventually becoming employed by its subsidiary, defendant DAS, in Indianapolis.  Dkt. No. 1-3 ¶ 12. In or about August 2006, Dr. Karr was an Intellectual Capital Manager ("ICM") in DAS's Intellectual Capital Management Group ("ICM Group").  Dkt. No. 43-13 ¶ 5.  The ICM Group was responsible for managing intellectual property portfolios for business units within DAS.  Dkt. No. 43-1 at 4.  When Dr. Karr joined the ICM Group, it consisted of herself, Lynn Zettler ("Zettler"), and Raghav Ram, who all worked as ICMs.  Dkt. No. 43-1 at 4. Subsequently, Zettler became the supervisor of the ICM Group.  Dkt. No. 43-13 ¶ 3. Throughout Dr. Karr's employment with DAS, Human Resources Manager Michael Barton ("Barton") oversaw human resources for the ICM Group. Dkt. No. 43-6 ¶ 9.

Sometime in 2007, Dr. Karr began missing numerous work days as a result of mental health issues.  Dkt. No. 43-1 at 8, 10.  Zettler became concerned over the decreasing volume of work Dr. Karr was completing.  Dkt. No. 43-13 ¶ 6.  In November 2007, Dr. Karr and Zettler met in a conference room at DAS, and both recognized that Dr. Karr's absences were a problem.  *Id.* ¶ 7; dkt. no. 43-1 at 10.

In early 2008, Dr. Karr exhibited increased issues with keeping projects straight and multitasking.  Dkt. No. 43-13 ¶¶ 9–10.  Zettler determined that Dr. Karr should be placed on a Performance Improvement Plan ("PIP").  *Id.* ¶ 11.  In preparing Dr. Karr's PIP, Zettler used information received from Barton when placing a previous employee on a PIP, tailoring those documents to Dr. Karr's situation.  *Id.* ¶ 12.

On August 8, 2008, Zettler met with Dr. Karr and presented her with the PIP.  *Id.* ¶ 13.  Zettler noted a number of issues with Dr. Karr's performance, including project

deficiencies and a lack of initiative. *Id.* ¶ 14 & Ex. 1.  Zettler further noted that work in the ICM Group would continue to be heavy, remarking that it would take working ten to twelve hour days to meet all client expectations.  *Id.* ¶ 15.  Dr. Karr told Zettler that she would have difficulty giving more than eight hours a day.  Dkt. No. 43-1 at 24.  Zettler explained that if Dr. Karr's performance was satisfactory at the end of the PIP period on February 8, 2009, Dr. Karr would be removed from the PIP.  *Id.* at 19.  Although Zettler encouraged Dr. Karr to explore other opportunities, neither Zettler nor the PIP indicated that Dr. Karr's employment would be terminated if she did not resign.  *Id.* at 25–26; dkt. no. 43-3 at 20–21.

During the August 8, 2008 meeting, Dr. Karr contends that Zettler told her that if she chose to retire early, she would receive a pension as well as a severance package.  Dkt. No. 43-1 at 21, 29.  Defendants dispute that Zettler made any statement promising Dr. Karr severance.  Dkt. No. 42 at 5 n.1.  Dr. Karr stated that Zettler told her this statement "off the record" to give her a "heads up."  Dkt. No. 43-1 at 21, 29.  Dr. Karr believed that the severance package Zettler was referring to was the same package that all employees received rather than something specific to Dr. Karr.  *Id.* at 31.  The effect of FMLA leave on severance was not discussed, and Dr. Karr did not tell Zettler that she was contemplating taking FMLA leave.  Dkt. No. 43-13 ¶ 17.

Following the August 8, 2008 meeting, Dr. Karr spoke to Cindy Stum ("Stum") in DAS's Occupational Health Department about her options, including FMLA leave, sick pay, retirement, independent contract work, and separation packages.  Dkt. No. 43-12 ¶¶ 7–8.  Stum referred Dr. Karr to DAS's Human Resources Department to discuss these options.  *Id.* ¶ 8.  Specifically, Stum directed Dr. Karr to Barton to discuss severance, but Dr. Karr did not speak with Barton at that time.  *See* dkt. no. 43-1 at 62.

3

On August 25, 2008, Dr. Karr did not come to work.  Dkt. No. 43-12 ¶ 11.  Dr. Karr

sent a email to Stum:

> Hi Cindy,
>
> Okay, I surrender.  I am losing it more each day.  I think for the short term I need to get on the FMLA.  I haven't slept in days and the urges to [sic] bad things to myself (and now others) is becoming unbearable.  I see my therapist first thing tomorrow morning.  What do I need to do when I see her?
>
> I feel like I am a big disappointment to you and everyone else.  I'm so sorry.
>
> Laura
>
> PS am I correct in recalling that using the FMLA will not result in my job being eliminated for 6 months and will still allow me to opt for retirement if I am unable to resume that job after the 6 months.

*Id.* ¶ 10 & Ex. 1.  Stum responded to the email within the hour.  *Id.* ¶ 12.  On or about

August 26, 2008, Dr. Amber Fleming ("Dr. Fleming"), Dr. Karr's health care provider, faxed

a letter to DAS requesting three weeks leave for Dr. Karr, with the possible need for

continued leave, and stating that Dr. Karr's condition impairs her from "effectively

completing her job responsibilities."  Dkt. No. 43-1 at 39.  This was the first time Dr. Karr

had requested or received FMLA leave from DAS.  Dkt. No. 43-12 ¶ 15.

On August 27, 2008, DAS sent Dr. Karr a letter preliminarily designating her time off

as protected FMLA leave and requiring Dr. Karr to return certain forms within fifteen days.

On September 12, 2008, after receiving Dr. Karr's forms, DAS sent her another letter

granting FMLA leave and informing her that it would run concurrently with DAS's paid

medical leave and, so long as Dr. Karr remained medically unable to work, the paid medical

leave would continue for up to six months even though her twelve weeks of FMLA leave

would expire.  Dkt. No. 43-1 at 42.  Throughout Dr. Karr's FMLA leave, her physicians

provided regular reports to DAS confirming that she remained unable to work. *Id.* at 41. DAS held Dr. Karr's position open during her FMLA leave.  Dkt. No. 43-3 at 10.

On approximately November 14, 2008, DAS sent Dr. Karr a letter informing her that her FMLA leave was expiring and providing information about DAS's medical leave program and long term disability.  Dkt. No. 43-1 at 46.  Dr. Fleming still would not release Dr. Karr to return to work "in any capacity," stating that her "concentration is severely disrupted and she would not be able to perform sustained work duties." *Id.* at 47–48.  Dr. Karr used all of her FMLA leave. *Id.* at 43.

On November 23, 2008, in light of Dr. Karr's continued inability to return to work, DAS informed Dr. Karr that it was backfilling her position.  Dkt. No. 43-1 at 48.  In its letter, DAS indicated that Dr. Karr was eligible for additional paid medical leave through February 25, 2009, and if she could return to work before that date, Dr. Karr would be considered for any open positions for which she was qualified.  Dkt. No. 43-2 at 23.  If no positions were available when Dr. Karr could return to work, she would be asked to use any unused vacation time during the search period, but she would be able to compete for any open positions for which she was qualified. *Id.*  If Dr. Karr was unable to return to work prior to February 25, 2009, she would either be switched to long term disability benefits, if approved, and her DAS employment would end, or she would be separated from employment with DAS. *Id.*

On February 6, 2009, DAS sent Dr. Karr a letter informing her that her paid medical leave would expire on February 24, 2009.  Dkt. No. 43-2 at 36.  If Dr. Karr was not released to return to work by this date, she could choose to remain on DAS's payroll until she became eligible for long term disability benefits or used all of her remaining vacation time,

5

extending her separation date to as late as April 8, 2009.  *Id.*  The letter also informed Dr. Karr that she was eligible for early retirement.  *Id.*

By February 25, 2009, Dr. Karr had exhausted her medical leave and still was unable to return to work.  Dkt. No. 43-1 at 53.  Dr. Karr contacted Barton and informed him that she was "ready to take the voluntarily [sic] retirement."  *Id.* at 57.  Barton denies discussing severance during that conversation, although Dr. Karr contends that it was discussed.  *Compare* dkt. no. 43-6 ¶ 24, *with* dkt. no. 43-1 at 57–58.

After receiving the retirement paperwork from DAS, Dr. Karr contacted DAS and asked when she would receive her severance payment.  Dkt. No. 43-6 ¶ 24.  Barton informed Dr. Karr that he did not think she was eligible for severance, but he would confer with Hank Head ("Head"), his supervisor, about the situation.  *Id.* ¶ 25.  Head confirmed that Dr. Karr was ineligible for severance under the USSP.  Dkt. No. 43-4 at 4–5.  On March 27, 2009, DAS sent a letter to Dr. Karr confirming her ineligibility for severance.  Dkt. No. 43-6 ¶ 28 & Ex. 9.

On April 8, 2009, Dr. Karr's retirement became effective, and she began receiving a pension.  In January 2010, Zettler filled Dr. Karr's position in the ICM Group.  Dkt. No. 43-6 ¶¶ 36–37.   The ICM Group also added more personnel, including another ICM, to complete its work.  *Id.* ¶¶ 32–33, 35, 38–40.

On approximately April 16, 2009, Dr. Karr's attorney, Michael Schultz ("Schultz"), sent Barton a letter asking for an explanation of why Dr. Karr was not eligible for severance and requesting the documents relied upon by DAS in making this determination but received no response.  *See* dkt. no. 43-9 at 13.  On September 24, 2009, Schultz sent another letter to Barton, who forwarded it to Rick Cassiday ("Cassiday"), the Human

Resources Director for North America for Dow Chemical Company and the Plan Administrator for the USSP.  Dkt. No. 43-8 ¶¶ 3–4, 8.  Cassiday investigated Dr. Karr's case and on approximately November 13, 2009, Cassiday sent a letter to Schultz informing Schultz that Dr. Karr was not eligible for USSP and was not a Covered Participant.  *Id.* ¶ 11.  Specifically, Cassiday stated that Dr. Karr's separation resulted from exhaustion of medical leave followed by early retirement, which did not satisfy the eligibility or Covered Participant requirements.  Dkt. No. 43-9 at 18–20.  Cassiday informed Schultz that Dr. Karr could send a written request within sixty days to the Review Committee to review his decision.  *Id.* at 20–21.

On approximately January 11, 2010, Schultz sent a letter to the Review Committee requesting reconsideration of the denial of Dr. Karr's severance benefits.  Dkt. No. 43-10 ¶ 9.  The Review Committee met to consider Dr. Karr's appeal.  *Id.* ¶ 11–12.  Dow's in-house counsel was present to advise the Review Committee members of their role as plan fiduciaries.  Dkt. No. 43-5 at 9–10.  Cassiday presented a summary of his investigation to the Review Committee but did not participate in its deliberations.  Dkt. No. 43-8 ¶¶ 15–16, 21, Ex. 12.  After reviewing correspondence from Dr. Karr and Schultz, as well as Cassiday's summary, summary plan descriptions, and the USSP itself, the Review Committee concluded that Dr. Karr was not eligible for severance benefits under the USSP.  Dkt. No. 43-10 ¶¶ 14, 16.  On or about March 12, 2010, the Review Committee sent Schultz a letter confirming their decision.  Dkt. No. 43-11 at 27–29.

The Court includes additional facts below as necessary.

## II.  LEGAL STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267–68 (7th Cir. 1990).  Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(a), which provides in relevant part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a material fact is genuinely disputed.  FED. R. CIV. P. 56(c)(1).  A genuine dispute of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine dispute of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence.  *See Bombard v. Ft. Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable

inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party.  *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996).  The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment.  *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996).  Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute.  *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).  If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the court to the lack of evidence as to an element of that claim.  *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994).  "If the nonmoving party fails to establish the existence of an element essential to [her] case, one on which [she] would bear the burden of proof at trial, summary judgment must be granted to the moving party."  *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

## III.  DISCUSSION

### A.  DENIAL OF SEVERANCE BENEFITS UNDER ERISA

The Court first addresses Dr. Karr's primary allegation that Defendants denied her severance benefits under the USSP in violation of ERISA, specifically 29 U.S.C. § 1132(a)(1)(B).

ERISA was enacted "to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989).  A "participant or beneficiary" under an

ERISA plan may bring a civil action "to recover benefits due to him under the terms of his plan[.]" 29 U.S.C. § 1132(a)(1)(B).  A denial of benefits challenged under ERISA "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire*, 489 U.S. at 115.  To lower the standard of review from *de novo* to arbitrary and capricious, "the plan should clearly and unequivocally state that it grants discretionary authority to the administrator." *Perugini-Christen v. Homestead Mortg. Co.*, 287 F.3d 624, 626 (7th Cir. 2002).  In other words, plenary review is presumed absent clear language to the contrary.  *Herzburger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000).  The party seeking deferential review has the burden of proof on the issue. *Sperandeo v. Lorillard Tobacco Co., Inc.*, 460 F.3d 866, 870 (7th Cir. 2006).

The parties spend a large portion of their summary judgment briefing discussing whether Defendants' decision is properly reviewed under the *de novo* or arbitrary and capricious standard of review.  However, for the reasons discussed below, Defendants prevail even under the less deferential *de novo* standard of review.  Therefore, the Court makes no determination as to whether the *de novo* or arbitrary and capricious standard applies and proceeds under the *de novo* standard.

Under the *de novo* standard, it is the responsibility of the Court to come to an independent decision on the legal and factual issues, regardless of what happened before the plan administrator.  *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007).  In construing the terms of the plan, the Court employs federal common law rules of contract interpretation, which requires interpreting terms "in an ordinary and popular sense," as "a person of average intelligence and experience" would interpret them.  *Id.* at

10

644.  When a plan term is ambiguous because it is subject to more than one reasonable interpretation, the ambiguity will be construed in favor of the insured.  *Id.*

In order to receive severance benefits under the USSP, Plaintiff must be both "eligible to participate" and qualify as a "Covered Participant" as that term is defined in the USSP.  Dkt. No. 43-10 at 28.  The USSP defines eligible as follows:

> In order to be eligible to participate in USSP, a Participating Employer must determine that you meet the following requirements:
>
> 1)    On or after June 1, 2007, you are a U.S.-based, regular full-time Salaried Employee of a Participating Employer . . . and
>
> 2)    You Separate from Service on or after June 1, 2007 for a USSP Qualifying Reason, a determination that is solely in the discretion of the Participating Employer as a non-fiduciary and settlor, and
>
> 3)    Your employment is not terminated for "Cause[.]"

*Id.* at 29.  In this case, all parties agree that Dr. Karr meets the first requirement for eligibility and DAS is a "Participating Employer."  However, the parties disagree as to whether Dr. Karr's employment ended for a "Qualifying Reason."

The USSP provides for two Qualifying Reasons: "Job Elimination or Redundancy" and "Workplace Efficiency Enhancement."  *Id.* at 30.  The USSP defines "Job Elimination or Redundancy" as "a decision by the Participating Employer . . . to consolidate or eliminate one or more positions in a Work Unit which results in a reduction in the total number of personnel in the Work Unit[.]"  Dkt. No. 43-8 at 33.  When Dr. Karr separated from DAS, she was replaced by another worker, and more workers were subsequently hired in her work unit.  Dkt. No. 43-13 ¶¶ 21–23.  Therefore, the Court concludes that Dr. Karr's separation was not the result of a "Job Elimination or Redundancy."

11

Accordingly, in order to be eligible for severance, Dr. Karr's separation must have resulted from a "Workforce Efficiency Enhancement."  Dkt. No. 43-10 at 30.  The USSP defines "Workforce Efficiency Enhancement" as

> an individual's involuntary Separation from Service because of (1) his or her failure or inability to satisfactorily achieve current job level performance expectations. . . . It does not include a Separation from Service based on an Employee's inability to return to work after exhausting available Medical Leave, Family Leave, or any other kind of Leave of Absence, or . . . the Employee's voluntary Separation from Service.

*Id.* at 49.   Defendants contend that Dr. Karr's separation from DAS was voluntary retirement following the exhaustion of medical leave and, therefore, fails to qualify as a "Workforce Efficiency Enhancement."  Dr. Karr contends that because she was unable to compete the PIP, she did not meet job performance expectations.

Based upon the clear language of the Workplace Efficiency Enhancement definition in the USSP, it is not enough that Dr. Karr was not meeting job performance expectations; she must also have been "involuntarily Separat[ed] from Service because of" that failure to meet expectations.  *Id.*  Dr. Karr admits that she accepted early retirement.  Dkt. No. 47-1 at 16–18.  Therefore, Dr. Karr prevails only if she can show that her "retirement" was actually involuntary—that is, a form of constructive discharge.   To prevail under a constructive discharge theory, Dr. Karr must show that DAS "ma[de her] working conditions so intolerable that [she was] forced into an involuntary resignation."  *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 314 (7th Cir. 1986).  "[A]n employee is not constructively discharged whenever he elects to leave a job he would, on the whole, rather keep, without regard to the actual reason for his departure."   *Id.*  In this case, there is no evidence suggesting that DAS made Dr. Karr's working conditions intolerable.  Therefore, the Court

12

concludes that Dr. Karr was not constructively discharged, and her early retirement was voluntary.   Dr. Karr's separation from employment was not a "Workplace Efficiency Enhancement" as that term is defined in the USSP.

Dr. Karr asserts that, even if she is not technically eligible for severance under the USSP, she should still receive severance based on purported representations from Zettler that if she retired, she would be eligible for severance.   In the context of ERISA plans, estoppel may only be applied under extreme, limited circumstances.   *See Pearson v. Voith Paper Rolls, Inc.*, 656 F.3d 504, 509 (7th Cir. 2011).   To prevail on an ERISA estoppel claim, a plaintiff must show "(1) a knowing misrepresentation; (2) made in writing; (3) with reasonable reliance on that misrepresentation . . . (4) to [the plaintiff's] detriment."   *Coker v. Trans World Airlines*, 165 F.3d 579, 585 (7th Cir. 1999).   Dr. Karr contends that Zeller's statements were oral.   Dkt. No. 43-1 at 33.   Because ERISA estoppel requires any misrepresentation be made in writing, *see Coker*, 165 F.3d at 585, the Court concludes that ERISA estoppel is not warranted in this case.

Interpreting the language of the USSP "in an ordinary and popular sense" as "a person of average intelligence and experience" would interpret it, the Court concludes that Dr. Karr separation was not for a "Qualifying Reason," even under *de novo* review.   *Diaz*, 499 F.3d at 643–44.   Therefore, she is ineligible to participate in the USSP.   *See* dkt. no. 43-10 at 28.   The Court **GRANTS** Defendants summary judgment on this claim.

## B.  OTHER ERISA CLAIMS

### 1. BREACH OF FIDUCIARY DUTIES

Dr. Karr contends that, even if she is not entitled to severance benefits under 29 U.S.C. § 1132(a)(1)(B), she can recover under 29 U.S.C. § 1132(a)(3) ("§ 1132(a)(3)") for violation of fiduciary duties.  Under this "catchall" provision, a "participant, beneficiary, or fiduciary" may bring a civil action "to obtain other appropriate equitable relief . . . to redress such violations or . . . to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3)(B).  Defendants contend that, because Dr. Karr's claim is properly analyzed under 29 U.S.C. § 1132(a)(1)(B), "repackaging" the denial claim under § 1132(a)(3) is impermissible.  *See Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996); *Mondry v. Am. Family Mut. Ins. Co.*, 557 F.3d 781, 804–05 (7th Cir. 2009).

Section 1132(a)(3) "act[s] as a safety net, offering appropriate equitable by violations that [29 U.S.C. § 1132] does not elsewhere adequately remedy."  *Varity Corp.*, 516 U.S. at 512.  To that end, this Court has found § 1132(a)(3) and 29 U.S.C. § 1132(a)(1)(B) to be mutually exclusive.  *See Bandak v. Eli Lilly & Co. Retirement Plan*, No. 1:06-cv-1622, 2007 WL 2694615, at *2 (S.D. Ind. Sept. 10, 2007) (plaintiff "may not seek relief under subsection (a)(3) because he potentially may recover benefits under subsection (a)(1)(B)"); *see also Biglands v. Raytheon Employee Savs. & Inv. Plan*, 801 F. Supp. 2d 781, 783–84 (N.D. Ind. 2011) (same); *White v. Sundstrand Corp.*, No. 98-C-50070, 2000 WL 713739, at *12 (N.D. Ill. May 23, 2000) (cannot bring claims under both sections seeking same remedy).  The Court concludes that Dr. Karr's claim properly falls under 29 U.S.C. § 1132(a)(1)(B) and, therefore, she may not also pursue a claim under § 1132(a)(3). Defendants are **GRANTED** summary judgment on this claim.

14

## 2. FAILURE TO PROVIDE REQUESTED DOCUMENTS

Dr. Karr further requests statutory damages for failure to provide the documents used to determine her eligibility for severance in a timely matter.  ERISA provides that a plan "administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description . . . or other instruments under which the plan is established or operated."  29 U.S.C. § 1024(b)(4).  If the administrator fails to comply with such a request within thirty days, the Court may, in its discretion, award the participant up to $100 a day for the delay.  29 U.S.C. § 1132(c)(1)(B).

Dr. Karr, through Schultz, her attorney, made two requests for documents.  On April 16, 2009, Schultz sent a letter to Barton requesting "copies of any and all documents . . . on which you relied (or on which Dow Agro relied) in making the determination that Ms. Karr was not eligible for severance. . . . [and] a written explanation of why the company is refusing to pay Ms. Karr a severance benefit."  Dkt. No. 1-4 at 2.  On September 24, 2009, Schultz sent another letter to Barton.  *Id.* at 3.  On November 17, 2009, Cassiday sent a letter to Schultz with a written explanation of the USSP's decision and the summary plan description.  *See id.* at 6–31.  Defendants contend that they are entitled to summary judgment on this claim because Dr. Karr was not a beneficiary or participant in the USSP, did not adequately specify the documents she wished to receive, and did not direct and inquiries to Cassiday—the designated administrator of the USSP—or join him as a defendant in this action.  Dr. Karr contends that, although Cassiday is not named as a defendant in this action, her claim is viable because Cassiday had notice of her request and the USSP indemnifies Cassiday such that the USSP is the real party in interest.  Because the identity of the plan administrator is outcome-determinative in this instance, the Court

expresses no opinion on any of Defendants' other arguments.

Under ERISA, only the plan administrator can be held liable for failure to provide requested documents. *Mondry*, 557 F.3d at 794; *see also Klosterman v. W. Gen. Mgmt., Inc.*, 32 F.3d 1119, 1122 (7th Cir. 1994) (collecting cases). The USSP lists the Dow Chemical Company as the plan administrator and allows for delegation of administrative authority. Dkt. No. 43-8 at 14. Defendants contend that Cassiday is the plan administrator pursuant to a valid delegation. *See* dkt. no. 43-8 at 7. In any event, to trigger damages for failure to provide documents, Dr. Karr must have made a request for documents to the plan administrator. 29 U.S.C. § 1024(b)(1). Even viewing the evidence in the light most favorable to Dr. Karr, *see Estate of Cole*, 94 F.3d at 257, even if Cassiday had actual notice of Dr. Karr's request, all requests were addressed to Barton, and there is no evidence that Barton is the plan administrator. Because no request for documents was made to the plan administrator, Defendants cannot be held liable for failure to provide such documents. *Accord. Mondry*, 557 F.3d at 794. The Court **GRANTS** Defendants summary judgment on this claim.

### C.  RETALIATION UNDER FMLA

Dr. Karr further contends that Defendants retaliated against her for taking FMLA by denying her severance benefits.[1] Claims for retaliation under FMLA are assessed in the same manner as retaliation claims under other statutes, such as the Americans with

---

[1]  Dr. Karr's complaint appears to include allegations that Defendants retaliated against her by eliminating her position while she was on FMLA leave. Compl. ¶ 34. However, as Dr. Karr does not raise this argument in response to Defendants' request for summary judgment, the Court considers such argument waived. *Accord. McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1098 (S.D. Ind. 2008) (McKinney, J.).

Disabilities Act or Title VII. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 n.3 (7th Cir. 2004). To prove a retaliation claim, Dr. Karr must show that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal connection exists between the two. *Daughtery v. Wabash Ctr.*, 577 F.3d 747, 751 (7th Cir. 2009). Such a claim may proceed under either the direct or indirect method of proof. *Buie*, 366 F.3d at 503. Dr. Karr does not argue that she meets the requirements of the indirect method of proof, *see generally* dkt. no. 46 at 32–34, so the Court will proceed to evaluate her claim under the direct method only. *Accord. McConnell*, 573 F. Supp. 2d at 1098 (failure to develop legal argument at summary judgment results in waiver of argument).

"Under the direct method, a plaintiff must present evidence that his employer took materially adverse action against him on account of his protected activity." *Burnett v. LFW Inc.*, 472 F.3d 471, 481 (7th Cir. 2006) (citing *Phelan v. Cook Cnty.*, 463 F.3d 773, 787 (7th Cir. 2006)). A "materially adverse" action is one that "could well dissuade a reasonable worker" from engaging in protected activity. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 52, 57 (2006). Examples of materially adverse actions include termination of employment, demotion evidenced by a decrease in wage or salary, or a "material loss of benefits." *Crady v. Lib. Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993). However, a "material loss of benefits" such as a bonus is not a materially adverse action when the employee was not entitled to such a benefit in the first place. *Rebinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir. 1996). In this case, as discussed above, Dr. Karr was not eligible for severance benefits because she elected early retirement. Accordingly, Defendants took no materially adverse action by denying severance. Therefore, her FEMA retaliation claim fails, and Defendants are entitled to summary judgment.

17

## D.  STATE LAW CLAIMS

Lastly, Dr. Karr asserts various claims under Indiana law, including breach of contract and negligent misrepresentation.   Dr. Karr admits that these were pled as alternative theories of recovery in the event the Court concludes that the subject matter of this case is not preempted by ERISA.  Dkt. No. 46 at 34–35.  Claims by a beneficiary for wrongful denial of benefits under an ERISA plan, no matter how they are styled, are preempted by ERISA.  *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 638–39 (7th Cir. 2004) (citing *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 62–63 (1987)).  All of Dr. Karr's state law claims contend that Defendants wrongfully prevented her from receiving severance benefits.  Consequently, the Court concludes that Dr. Karr's state law claims are within the subject matter preempted by ERISA and **GRANTS** summary judgment to Defendants on them.

## IV.  CONCLUSION

For the reasons set forth herein, Defendants' Motion for Summary Judgment [Dkt. No. 41] is **GRANTED** in its entirety.  A separate judgment shall issue.

IT IS SO ORDERED this 19th day of April, 2012.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

Distribution to:

Kim F. Ebert
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
kim.ebert@ogletreedeakins.com

Bonnie L. Martin
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
bonnie.martin@odnss.com

Michael L. Schultz
PARR RICHEY OBREMSKEY FRANDSEN & PATTERSON LLP
mschultz@parrlaw.com